# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **SECRETARY OF U.S. DEPARTMENT OF LABOR,** | **CASE NO. 1:19-CV-00968** |
| **Plaintiff,** | **JUDGE PAMELA A. BARKER** |
| **-vs-** | |
| **ROBERT KAVALEC, et al.,** | |
| **Defendants.** | **MEMORANDUM OPINION AND ORDER** |

This matter comes before the Court upon the Motion for Preliminary Injunction Removing the Fund's Current Trustee and Appointing an Independent Fiduciary, filed by Plaintiff Secretary of Labor Martin J. Walsh (the "Secretary"), United States Department of Labor on September 3, 2021. (Doc. No. 186.)  Defendant Fleet Owners Insurance Fund (the "Fund") filed a Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction on September 17, 2021, to which the Secretary replied on September 24, 2021.  (Doc. Nos. 189, 190.)  The Fund then filed a separate Motion to Strike the Secretary's Reply Brief on September 27, 2021, which the Secretary opposed on October 7, 2021.  (Doc. Nos. 191, 192.)

Also pending are two separate Motions for Trial Dates.  On August 30, 2021, the Fund filed a Renewed Motion [ ] for Trial Date.  (Doc. No. 182.)  On September 15, 2021, Defendant Robert Kavalec, proceeding *pro se*, filed a Motion [ ] for Trial Date.  (Doc. No. 188.)

For the following reasons, the Secretary's Motion for Preliminary Injunction is GRANTED, the Fund's Motion to Strike is DENIED, and the Fund's and Kavalec's Motions for Trial Dates are DENIED.

## I.      Background

The Court previously set forth much of the relevant factual background in its July 14, 2020 Memorandum Opinion and Order ("July 14, 2020 Order") and January 25, 2021 Memorandum Opinion and Order ("January 25, 2021 Order") and will not repeat it here.  (*See* Doc. Nos. 92, 120.) The Court presumes the parties' familiarity with its previous opinions in this case and will only set forth the relevant background since the Court's January 25, 2021 Order.

### A.      Events Since January 25, 2021

Throughout the first half of 2021, the Court held three status conferences to accommodate the parties' attempts to settle this case.  (*See* Doc. Nos. 122, 141.)  During the third status conference on July 22, 2021, it became clear the parties would be unable to resolve the matter due to certain putative Medical Mutual claims (discussed *infra*).  (*See* ECF Entry 7/23/2021.)  The Court also learned that the Fund continued to pay Kavalec's monthly personal cell phone bills even after the Court *unambiguously* enjoined Kavalec from "paying himself direct *or indirect* compensation from" Fund assets.  (*Id.* at PageID# 1811, emphasis added.)  Further, the Secretary made it clear that he intended to seek Kavalec's removal as trustee of the Fund.  (*See* ECF Entry 7/23/2021.)

On July 27, 2021, before the Secretary moved for Kavalec's removal, former Fund counsel Lance Johnson notified the parties that Kavalec had resigned as Employer Trustee, effective July 26, 2021.  (Doc. No. 184-1, PageID# 2768.)  Kavalec's final act as trustee was to appoint Alley M. Pesto, the Fund's part-time office manager, as his successor trustee.  (*Id.*)  Pesto's tenure as Employer Trustee was short-lived.  One of Pesto's only acts as trustee was to direct the Fund to file a Motion to Clarify the Court's January 25, 2021 Order on her behalf.  In the Motion, the Fund explained that Pesto was "concerned this Court's prior order enjoining former Trustee Kavalec from receiving

compensation . . . may be interpreted to apply to her and seeks clarification."  (*See* Doc. No. 175, PageID# 2688-89.)  On August 18, 2021, the Court clarified that an ERISA trustee, such as Pesto, was "absolutely barred from paying himself or herself a salary from Fund assets under ERISA § 406(b)(1)."  (Doc. No. 179, PageID# 2711.)

Two other events occurred on August 18, 2021.  First, Johnson notified the Secretary that Pesto had resigned as Employer Trustee and that the new Employer Trustee was Milo Valenti.  (Doc. No. 180-1, PageID# 2718.)  Second, Valenti filed a lawsuit against Teamsters Local 964 ("Local 964") in the Cuyahoga County Court of Common Pleas ("the Union Trustee action").[1]  (*See* Doc. No. 180-4, PageID# 2735.)  In the Union Trustee action, the Fund seeks to compel Local 964 to appoint a second trustee to the Fund because, allegedly, the Fund "is not properly constituted under the Trust Agreement without two trustees" and is "not able to fulfill its mission without the participation of a Union Trustee."  (Doc. No. 184-3, PageID# 2870-71.)

On September 3, 2021, Johnson filed a Motion to Withdraw as the Fund's Attorney, which the Secretary did not oppose, and the Court granted.  (*See* Doc. Nos. 183, 187.)  The Fund is now represented by Johnson's former associate, Jacob Hailperin-Lausch.[2]  (*See* Doc. No. 183.)

Also on September 3, 2021, the Secretary filed the instant Motion for Preliminary Injunction Removing the Fund's Current Trustee and Appointing an Independent Fiduciary.  (Doc. No. 186.) The Fund filed an Opposition to the Secretary's Motion on September 17, 2021.  (Doc. No. 189.) The Secretary filed his Reply to the Fund's Opposition on September 24, 2021.  (Doc. No. 190.)

---

[1] Local 964 removed the Union Trustee action to this Court on September 2, 2021.  *See* ECF Doc. No. 1, *Fleet Owners Insurance Fund v. Teamsters Local Union No. 964 et al.*, No. 1:21-cv-1719-PAB (N.D. Ohio).

[2] As of August 5, 2021, Johnson still considered Hailperin-Lausch to be his associate.  That day, Johnson warned the Secretary's counsel that "Jacob [Hailperin-Lausch] is [Johnson's] associate," and that Hailperin-Lausch "is not a partner yet so all Fund conversations must involve" Johnson.  (Doc. No. 184-1, PageID# 2755.)

On September 27, 2021, the Fund moved to strike the Secretary's Reply.  (Doc. No. 191.) The Secretary filed an Opposition to the Fund's Motion to Strike on October 7, 2021.  (Doc. No. 192.)

### B.    The Medical Mutual Claims

During the July 22, 2021 status conference, the parties addressed the existence of certain Medical Mutual claims.  The Medical Mutual claims are potentially a significant source of liability against the Fund.  These claims bear on the Court's decision below and merit a brief overview.

While the Fund was in operation, the Fund entered into an agreement with Medical Mutual Services, LLC ("Medical Mutual"), whereby Medical Mutual would act as the Fund's claims administrator.  (Doc. No. 30-1, PageID# 334.)  As claims administrator, Medical Mutual agreed to receive and process claims for benefits under the Fund's benefit Plan ("Plan") and disburse claims payments under the Plan.  (*Id.*)  According to the Plan's Summary Plan Description ("SPD"), the Fund would issue membership cards to Plan participants.  (Doc. No. 185-1, PageID# 3090.)  Plan participants were told to present their membership cards when receiving services from healthcare providers.  (*Id.*)  According to the SPD, the participant's "healthcare provider will normally submit a claim on the Covered Person's behalf."  (*Id.*)  In other words, after a participant received a service from his or her provider, the provider would then submit a claim to Medical Mutual to receive payment for the service rendered.  (*Id.* at PageID# 3122.)  Medical Mutual would pay the provider for the submitted claim.  (Doc. No. 30-1, PageID# 351.)  Medical Mutual would then send weekly invoices to the Fund "for claims paid by Medical Mutual Services during the preceding week . . . ." (*Id.*)  Pursuant to the Fund's agreement with Medical Mutual, the Fund agreed to "pay the invoiced amounts on the second business day following the date of the invoice."  (*Id.*)  According to the

4

agreement, "[i]f payment of the invoice is not received when due, Medical Mutual Services *will* suspend processing of the group's claims and *will not* release future claim payments until payment is received from the Plan Sponsor." (*Id.*, emphasis added.)

In early 2019, the Fund and Medical Mutual were embroiled in litigation. *See McHugh v. Trinity Health Sys.*, No. 1:17-CV-1413, 2018 WL 4932500 (N.D. Ohio Jun. 25, 2018), *report and recommendation adopted* 2018 WL 4501054 (N.D. Ohio Sept. 20, 2018). Sometime in early 2019, the Fund stopped paying Medical Mutual's invoices altogether. (Doc. No. 185-1, PageID# 3108.) On March 1, 2019, Medical Mutual terminated its agreement with the Fund, effective immediately. (Doc. No. 185-1, PageID# 3108.) Medical Mutual informed the Fund that it was "seriously delinquent in its payment of claims for members" and that "[n]o weekly claims invoices have been paid for the last eight weeks and over $1.7 million in claims are on hold." (*Id.*) According to Medical Mutual, this termination meant "that the claims that are currently on hold will be rejected and covered persons will be notified that the group has failed to pay these claims." (*Id.*) However, medical providers continued to submit claims to Medical Mutual for services rendered to Fund participants on or after March 1, 2019. The Secretary estimates that the gross total of claims submitted to Medical Mutual between March 1, 2019 and March 4, 2020 is approximately $2 million and that the Fund's liability may range from approximately $653,000 to $1.4 million.[3] (Doc. No. 186, PageID# 3144-45.)

It does not appear that the Medical Mutual claims have been resolved. On June 2, 2020, the Fund represented that "[o]ut of nearly 100 claims unresolved by Medical Mutual *as of March 1, 2019,*

---

[3] It is unclear whether the Secretary's liability estimate includes Medical Mutual claims dated prior to March 1, 2019, or if the Secretary only believes the Fund is liable for Medical Mutual claims dated between March 1, 2019 and March 4, 2020. At any rate, it is clear that the Fund is liable for some set of unpaid Medical Mutual claims resulting from the Fund's refusal to pay Medical Mutual invoices.

all have been resolved except four." (Doc. No. 87-1, PageID# 1394, emphasis added.)  The Fund's June 2, 2020 claims status report did not address any claims submitted to Medical Mutual *after* March 1, 2019 and prior to March 4, 2020.  On March 29, 2021, the Fund represented that there was just one claim—for less than $50,000—left to be resolved.  (Doc. No. 134, PageID# 1853.)  In a July 2, 2021 email to the Secretary, Johnson asserted that "the MMS information the DOL is looking at" were "invoices, not claims." (Doc. No. 184-1, PageID# 2771.)  Further, Johnson wrote that "the Fund is willing to do all the work to show the invoices are not claims along the lines set forth in [the Secretary's] outline," even though Johnson believed such an effort to be "wasteful." (*Id.*)  During the July 22, 2021 status conference, the Secretary informed the Court that he and Johnson and Kavalec had reached an impasse regarding the Medical Mutual claims. (ECF Entry 7/23/2021.)  Johnson again asserted that these claims were not claims at all, but merely invoices for services. (*Id.*)  Johnson did not offer any evidence or explanation for his assertion that the Medical Mutual claims were only invoices, despite having offered to do so in his July 2, 2021 email. (*Id.*)  Since the July 22, 2021 status conference, it does not appear that the Fund, Kavalec, or the purported successor trustees have taken steps to address the Medical Mutual claims.

## II.    Standard of Review

"In general, courts must examine four factors in deciding whether to grant a preliminary injunction: (1) whether the movant has demonstrated a substantial likelihood of success on the merits, (2) whether the movant will suffer irreparable injury absent injunction, (3) whether a preliminary injunction would cause substantial harm to others, and (4) whether the public interest will be served by an injunction." *Flight Options, LLC v. Int'l Bhd. of Teamsters, Local 1108*, 863 F.3d 529, 539-40 (6th Cir. 2017).  "These factors are not prerequisites, but are factors that are to be balanced against

each other." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). However, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).  In addition, "[a] preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573. "The party seeking the injunction must establish its case by clear and convincing evidence." *Draudt v. Wooster City Sch. Dist. Bd. of Educ.*, 246 F. Supp. 2d 820, 825 (N.D. Ohio 2003).

## III.    Analysis

### A.    Likelihood of Success on the Merits

First, the Court considers whether the Secretary "has demonstrated 'a strong likelihood of success on the merits.'" *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). "In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).  Nonetheless, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

The Secretary asserts that he is likely to succeed on his self-dealing, disloyalty, and imprudence claims against Kavalec.  (Doc. No. 186, PageID# 3152.)  With respect to his self-dealing claims, the Secretary argues that the Court already twice concluded that the Secretary is likely to succeed on the merits of his self-dealing claims against Kavalec and, under the law-of-the-case doctrine, the Secretary has established a strong likelihood of success on those claims.  (*Id.*)  The

7

Secretary further argues that Kavalec's resignation and appointment of Pesto as trustee "should be viewed as a continuation of the already-established self-dealing violations, as well as violations of Kavalec's duties of loyalty and prudence to the Fund." (*Id.*)  The Secretary argues that Kavalec's resignation and appointment of Pesto as trustee was a blatant attempt to continue exerting control over the Fund while thwarting the appointment of an independent fiduciary to oversee the Fund. (*Id.*) The Secretary argues that Kavalec breached his fiduciary duty to the Fund when he resigned without appointing a "suitable and trustworthy replacement," and appointed Pesto instead. (*Id.* at PageID# 3153.)  The Secretary argues that the Court may invalidate Pesto's appointment altogether and, therefore, the Court may also invalidate Pesto's subsequent appointment of Valenti. (*Id.* at PageID# 3153-54.)

In its Opposition, the Fund does not expressly address whether the Secretary is likely to succeed on his self-dealing, disloyalty, and imprudence claims against Kavalec. (*See* Doc. No. 189.) Rather, the Fund asserts that the Secretary's arguments regarding Kavalec's "alleged malfeasance" are moot because Kavalec is no longer a Fund trustee. (*Id.* at PageID# 3184.)  The Fund further argues that even if the Court concludes the Secretary's arguments are not moot, the Court "would have to issue an advisory opinion on Kavalec's actions" in order to "bridge the gap between Kavalec and Valenti . . . ." (*Id.* at PageID# 3185.)  The Fund argues that the Court "cannot retroactively form an opinion about the merits of removing a trustee who has already resigned" without impermissibly violating Article III of the Constitution and issuing an advisory opinion. (*Id.*)  The Fund also argues that the Secretary failed to cite any case law to support his assertion that the Court may invalidate a new trustee based on the alleged bad acts of a prior trustee. (*Id.*)  Further, the Fund refutes the Secretary's insinuation that Kavalec "hand-picked" his successor and argues that Kavalec was

8

required to choose his successor under the Trust Agreement. (*Id.*) The Court concludes that the Secretary has a strong likelihood of success on the underlying self-dealing, disloyalty, and imprudence claims against Kavalec.

First, the Court has already twice concluded that the Secretary has demonstrated a strong likelihood of success on the merits of his self-dealing claim against Kavalec. (*See* Doc. No. 92, PageID# 1442; Doc. No. 120, PageID# 1805.) The Court reaches the same conclusion for a *third* time. ERISA § 406(b) provides that a plan fiduciary shall not "(1) deal with the assets of the plan in his own interest or for his own account," or "(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." 29 U.S.C. §§ 1106(b)(1)-(2). According to the Sixth Circuit, this provision "contains an 'absolute bar against self dealing.'" *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740, 750 (6th Cir. 2014) (quoting *Brock v. Hendershott*, 840 F.2d 339, 341 (6th Cir. 1988)). In both its July 14, 2020 and January 25, 2021 Orders, the Court concluded that the Secretary submitted evidence that demonstrated Kavalec determined and/or approved his own compensation from the Fund while also acting as a Fund trustee. (Doc. No. 92, PageID# 1442-43; Doc. No. 120, PageID# 1806-07.) The Court further concluded that, given the Secretary's undisputed evidence, it appeared likely that Kavalec engaged in prohibited transactions under ERISA § 406(b). (*Id.*)

Now, the Secretary has submitted additional evidence that Kavalec *continued* to self-deal with Fund assets by utilizing Fund assets to pay his personal cell phone bills in spite of the Court's January 25, 2021 Order barring such conduct. (*See* Doc. No. 185-1, PageID# 3062.) According to the sworn Declaration of Department of Labor Senior Investigator Meghann Wilkinson, the Fund paid $531.55

9

for Kavalec's personal cell phone expenses between February 5, 2021 and May 31, 2021.  (*Id.*)

Johnson and Kavalec further confirmed that the Fund paid for Kavalec's personal cell phone expenses

during the July 22, 2021 status conference, when both Johnson and Kavalec admitted that the Fund

pays for Kavalec's cell phone bills.  (ECF 7/23/2021 Entry.)  Even though the Court *explicitly*

enjoined Kavalec from engaging in any further self-dealing with Fund assets in its January 25, 2021

Order, he continued to do so.  For this reason, and for the reasons previously set forth in the Court's

14, 2020 and January 25, 2021 Orders, the Court concludes the Secretary has established a strong

likelihood of success on the merits of his self-dealing claims against Kavalec.

The Court likewise concludes that the Secretary has demonstrated a likelihood of success on

the merits of his disloyalty and imprudence claims against Kavalec.  Under ERISA § 404,

> ERISA imposes three broad duties on qualified fiduciaries: (1) the duty of loyalty, (2) the prudent person fiduciary obligation, and (3) the exclusive benefit rule. [*James v.*] *Pirelli Armstrong Tire Corp.*, 305 F.3d 439[,] 448-49 [6th Cir. 2012]. Collectively, these duties serve the goal of ensuring that ERISA fiduciaries act "solely in the interest of [plan] participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

*Hi-Lex Controls, Inc.*, 751 F.3d at 751.  "ERISA therefore 'imposes an unwavering duty on an ERISA

trustee to make decisions with single-minded devotion to a plan's participants and beneficiaries and,

in so doing, to act as a prudent person would act in a similar situation.'"  *Pirelli Armstrong Tire Corp.*,

305 F.3d at 449 (quoting *Berlin v. Mich. Bell. Tele. Co.*, 858 F.2d 1154, 1162 (6th Cir. 1988)).

ERISA provides that "a person is a fiduciary with respect to a plan to the extent . . . he has

any discretionary authority or discretionary responsibility in the administration of such plan."  29

U.S.C. § 1002(21)(A).  Under ERISA, the appointment of another fiduciary is a fiduciary function

that can give rise to fiduciary liability.  *Leigh v. Engle*, 727 F.2d 113, 133 (citing ERISA Interpretive

Bulletin 75-8, 29 C.F.R. § 2509.75-8 (1983)).  "While fiduciary relationships generally, and under

10

ERISA in particular, are consensual in the sense that the parties must voluntarily enter a relationship having the stipulated characteristics, once a fiduciary relationship exists, *the fiduciary duties arising from it do not necessarily terminate when a decision is made to dissolve that relationship*." *Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Secs., Inc.*, 93 F.3d 1171, 1183-84 (3d Cir. 1996) (emphasis added). Rather, "[c]ourts that have considered the issue have held that an ERISA fiduciary's obligations to a plan are extinguished only when adequate provision has been made for the continued *prudent* management of plan assets." *Id.* (citations omitted) (emphasis added). Importantly, an ERISA trustee's "obligation to ensure that fiduciary obligations will continue to be met is a component of the prudence imposed by Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B) ('a fiduciary shall discharge his duties . . . with the care, skill, prudence and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would employ')." *Id.* (citations omitted).

Thus, "a trustee may be liable for a breach of fiduciary duty for resigning without providing for a 'suitable and trustworthy replacement.'" *Ream v. Frey*, 107 F.3d 147, 154 (3d Cir. 1997) (quoting *Friend v. Sanwa Bank Cal.*, 35 F.3d 466, 471 (9th Cir. 1994)). In other words, a trustee must "take prudent precautions, such as by providing for a 'suitable and trustworthy replacement,' to ensure that his resignation does not harm the Fund or its beneficiaries." *Sec'y of Labor v. Doyle*, 500 F. Supp. 3d 309, 324 (D.N.J.) (citing *Ream*, 107 F.3d at 154).

When an ERISA trustee fails to adequately provide for the continued prudent management of plan affairs, a court may invalidate the trustee's resignation and/or appointment of another trustee. *See Freund v. Marshall & Ilsley Bank*, 485 F. Supp. 629, 635 (W.D. Wisc. 1979) (concluding that four seller trustees' resignations were invalid and that they remained plan trustees after the date of

their purported resignations); *see also Katsaros v. Cody*, 744 F.2d 270, 282 (2d Cir. 1984) (concluding that ERISA's broad equitable powers allow courts to "remedy breaches of trust" by appointing alternative fund managers so as to avoid "the union and employers . . . thwart[ing] the objectives of ERISA by reappointing the same derelict representatives to continue the violations of their fiduciary duties") (abrogated on other grounds by *Sacerdote v. New York Univ.*, 9 F.4th 95, 119 n. 104 (2d Cir. 2021)).

The Court concludes that Kavalec failed to adequately provide for the continued prudent management of the Fund when he resigned and appointed Pesto, who was not "suitable or trustworthy" for the position of Employer Trustee.[4]  *See Ream*, 107 F.3d at 154.  The Court agrees with the Secretary that Pesto was not qualified for the role of Employer Trustee.  First, according to Pesto's resume, which Johnson circulated to the parties via email on July 27, 2021, Pesto's only experience with the Fund was working as the Fund's Office Manager/Benefit Specialist.[5]  (*See* Doc. No. 184-1, PageID# 2758, 2765-66.)  Pesto's responsibilities include, but are not limited to, depositing checks and keeping a ledger of payments, managing the website, answering questions about the Fund's schedule of benefits, completing insurance paperwork, and handling other administrative duties.  (*Id.*)  Pesto has no experience acting as a fiduciary in any capacity.  (*Id.*) Indeed, Pesto does not meet Johnson's own previously stated requirements for any replacement trustee. (Doc. No. 184-1, PageID# 2768.)  On May 12, 2020, in response to the Secretary's suggestion

---

[4] The Court's discussion of Pesto's qualifications is limited to the narrow question of whether she was a suitable replacement *for the role of Employer Trustee*.  The Court is cognizant that the phrase "suitable and trustworthy," as utilized in this Memorandum Opinion and Order, may sound unduly harsh.  The Court emphasizes that the phrase is derived from the applicable case law, which requires ERISA trustees, e.g., Kavalec, to provide for a "suitable and trustworthy" replacement, meaning a replacement who will ensure that the previous trustee's resignation does not harm participants.  *See Ream*, 107 F.3d at 154; *see also Doyle*, 500 F. Supp. 3d at 324.
[5] Since April 2019, Pesto has only worked as a part-time office manager for the Fund.  (Doc. No. 185-1, PageID# 3055-57.)

that Kavalec resign to allow the appointment of an independent fiduciary, Johnson wrote: "Having done this now for many years successfully I know it takes experience.  Any new person no matter how smart will have a steep ramp up curve and that will risk the Fund being able to help the Members with the remaining legitimate claims."  (*Id.*, PageID# 2852.)  It is puzzling, then, that Johnson wrote that he had "the honor to formally announce" Pesto as the new Employer Trustee when he insisted to the Secretary just 14 months prior that any replacement trustee must possess significant experience.  (*Id.*; *see also* Doc. No. 184-1, PageID# 2768.)

Second, Pesto was not "suitable or trustworthy" for the role of trustee, as that phrase is used in the applicable case law, because she participated in Kavalec's blatant self-dealing when she co-signed every paycheck Kavalec drew on the Fund's accounts after the Court's July 14, 2020 Order expressly enjoining Kavalec from doing so.  (*See* Doc. No. 108-3, PageID# 1688-1700.)  Third, Pesto allowed Fund counsel to file a motion seeking to reinstitute this same self-dealing with Fund assets.  (Doc. No. 175.)  As the putative trustee, Pesto authorized the use of Fund assets on the legal fees associated with filing a motion to clarify the Court's crystal-clear Orders.  This motion did nothing to advance Plan participants' interests and only succeeded in wasting Fund assets on additional legal bills.  Pesto's decision to utilize fund assets for filing such a Motion further indicates that Pesto is not a "suitable and trustworthy" replacement Employer Trustee because it demonstrates that Pesto condoned—and at times, participated in—the spending of Fund assets to the detriment of Plan participants.

This begs the question why Kavalec would appoint Pesto for the role of Employer Trustee. The Court agrees with the Secretary that Kavalec and Johnson sought out Pesto as a replacement because Kavalec wished to thwart the appointment of an independent fiduciary by installing Pesto,

who would continue to imprudently advance Kavalec's own personal interests, rather than the interests of the Fund. (Doc. No. 186, PageID# 3151.) Despite Johnson's bad faith assertion to the Secretary via email on July 27, 2021 that, as far as Johnson knew, "Mr. Kavalec has no further involvement with the Fund," there is ample evidence that Kavalec remained involved with the Fund following his purported "resignation." (Doc. No. 184-1, PageID# 2767.) First, on August 12, 2021, Pesto sent an email to the Fund's landlord, rescinding the Fund's notice that the Fund would vacate its Brook Park offices by August 31, 2021. (Doc. No. 184-3, PageID# 2921.) Pesto included Kavalec *and* Johnson on her email to the landlord—despite Kavalec's purported resignation as trustee three weeks earlier. (*Id.*) It makes little sense that Pesto, the purported trustee, included Kavalec, on such a mundane email about Fund administration, unless Kavalec remained actively involved in the Fund.

Second, on September 1, 2021, counsel for Local 964 sent a letter to purported trustee Valenti and Johnson, refusing Valenti's request to appoint a Union trustee. (Doc. No. 184-3, PageID# 2908-13.) Local 964's counsel wrote the following:

> Following my August 13, 2021 letter to Fund counsel outlining the Union's position rejecting the request to appoint a Union Trustee (see enclosed), **on August 17, 2021, former Fund Employer Trustee and Administrator Robert Kavalec visited the Union office unannounced and met with Local 964 Secretary-Treasurer Michael Moats.** As identified in your letter to the Union, Mr. Kavalec also is a Defendant in the pending DOL litigation. **At that time, Mr. Kavalec attempted to convince Mr. Moats to reverse the Union's stated position to withhold appointing a Union Trustee to the Fund, even though to our knowledge Mr. Kavalec no longer has any position with, or connection to, the Fund or its operations. When the Union's principal officer rejected Mr. Kavale[c]'s overtures, one day later, on August 18, 2021, the Fund filed a "Complaint for Specific Performance" against the Union** in the Court of Common Pleas, Cuayhoga County, Ohio in Case No. CV21951766. A copy of that Complaint is enclosed, prepared and filed by Attorney Jacob Hailperin-Lausch, who has the same business address as Mr. Johnson.

(*Id.* at PageID# 2911-2912, emphasis added.) Clearly, Kavalec was involved with the Fund as of August 18, 2021, since the Fund filed its suit against Local 964 within 24 hours of Moats's rejection

14

of Kavalec's demand that Local 964 appoint a trustee.  Despite his purported "resignation" on July 26, 2021, Kavalec remained involved in all manner of Fund business throughout at least August 2021, from the negotiation of office lease agreements to the decision to institute expensive litigation against Local 964.

The Court concludes that Kavalec's appointment of Pesto, an unsuitable and unqualified replacement, was a sham and an attempt to thwart ERISA's objectives by ensuring that Kavalec would be able to interfere in the Fund's business and protect his own interests, rather than those of the Fund's beneficiaries.  Kavalec had no intention of relinquishing actual control over the Fund when he appointed Pesto as his successor on July 26, 2021, nor any intention of ceasing his interference after Pesto purportedly appointed Valenti her successor.  Kavalec's appointment of Pesto and subsequent resignation violated Kavalec's ERISA duties of loyalty and prudence to provide for the continued prudent management of the Fund.  Pesto's appointment is invalid and, therefore, her subsequent appointment of Valenti is likewise invalid.  Kavalec remains trustee of the Fund after his purported "resignation" on July 26, 2021.  (*See* Doc. No. 184-1, PageID# 2770.)  Accordingly, the Court concludes that the Secretary has demonstrated a strong likelihood of success on the merits of his disloyalty and imprudence claims against Kavalec.

None of the Fund's counterarguments are persuasive.  First, the Fund's argument that the Secretary's Motion is moot because Kavalec has already resigned is unavailing.  (Doc. No. 189, PageID# 3184.)  Second, contrary to the Fund's assertion, the Court is not issuing an "advisory opinion" as to Kavalec's actions.  (*Id.* at PageID# 3185.)  Both arguments fail because Kavalec remains the trustee due to his invalid appointment of Pesto, and her invalid appointment of Valenti. *See supra*; *see also Freund*, 485 F. Supp. at 635.  As discussed at length above, "a trustee may be

liable for a breach of fiduciary duty for resigning without providing for a 'suitable and trustworthy replacement.'" *Ream*, 107 F.3d at 154.  The Fund fails to address the case law surrounding potentially invalid appointments of ERISA fiduciaries.  Rather, the Fund's arguments are premised on its unfounded assertion that Pesto "was more than qualified to be the Fund's trustee" based on her time as office manager.  (Doc. No. 189, PageID# 3183.)  As discussed above, not only was Pesto *not* qualified for the trusteeship, it is also apparent that Kavalec's appointment of Pesto was a sham to allow him to continue to interfere with Fund administration.[6]

Moreover, the Fund's citation to *Int'l Union of Auto. Workers v. Park-Ohio Indus.* is similarly unpersuasive.  (*Id.* at PageID# 3185.)  First, the Fund cites to a portion of *Int'l Union of Auto. Workers* that was subsequently reversed by the Sixth Circuit in *Int'l Union UAW Local 91 v. Park-Ohio Indus., Inc.*, 876 F.2d 894 (table) (6th Cir. 1989) (No. 88-3145, 1989 WL 63871, unpublished per curiam) (reversing the district court's grant of summary judgment to the union with respect to its breach of ERISA fiduciary duty claim).  Second, even if the *Int'l Union of Auto. Workers* court had not been reversed, the Fund's quoted sentence from the opinion, when read in the context of the entire paragraph, actually supports the Secretary's arguments.  While the *Int'l Union of Auto. Workers* court indeed observed that "[r]emoving the defendant as trustee is a step which should not be taken lightly," the court also observed that "[t]here is **no indication that Park-Ohio will not follow this Court's orders and provide the benefits to which plaintiffs are entitled**."  *Int'l Union of Auto. Workers v. Park-Ohio Indus.*, 687 F. Supp. 338, 340 (N.D. Ohio 1987) (aff'd in part and rev'd in part 876 F.2d 894 (table) (6th Cir. 1989) (No. 88-3145, 1989 WL 63871, unpublished per curiam)) (emphasis added).  Here, of course, there is every indication that the Fund and Kavalec will not follow this

---

[6] The Fund's final argument, that "Kavalec appointing Pesto and Pesto appointing Valenti are examples of trustees properly appointing qualified successors," is unpersuasive for this same reason.  (Doc. No. 189, PageID# 3186.)

Court's Orders. *See, e.g.,* July 14, 2020 Memorandum Opinion and Order, ECF Doc. No. 92; January 25, 2021 Memorandum Opinion and Order, ECF Doc. No. 120; August 18, 2021 Memorandum Opinion and Order, ECF Doc. No. 179; *supra* (concluding Kavalec continued to engage in self-dealing by using Fund assets to pay for his personal cell phone expenses throughout spring 2021).

Accordingly, the Court concludes that the Secretary has established a strong likelihood of success on his self-dealing, disloyalty, and imprudence claims against Kavalec.

### B.      Irreparable Injury

"[T]he second factor that a court must consider when deciding whether to issue a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction." *Certified Restoration*, 511 F.3d at 550.

The Secretary argues that, given Kavalec's and the successor trustees' refusal to properly address the Fund's outstanding claims, irreparable harm to the beneficiaries is certain, unless an independent fiduciary is appointed to resolve pending claims and wind down the Fund.  (Doc. No. 186, PageID# 3155-57.)  The Secretary further argues that the Fund's ability to ever pay the Medical Mutual claims is imperiled by Kavalec's and the successor trustees' wasteful spending of Fund assets on imprudent and disloyal expenses.  (*Id.* at PageID# 3159-60.)

In response, the Fund argues that the Secretary "admitted [he] ha[s] not met this burden" because the Secretary noted that Valenti's qualifications are "unknown."  (Doc. No. 189, PageID# 3187.)  The Fund contends that "Valenti remaining as trustee allows the Fund to have more assets available for the alleged, but as yet unsubstantiated, outstanding claims."  (*Id.*)  Moreover, the Fund asserts that all claims against the Fund are resolved and the Fund is ready to handle any additional claimants.  (*Id.*)  The Court concludes that the Secretary has established that it is necessary to remove

17

Kavalec and appoint an independent fiduciary to administer the Fund to prevent any further irreparable harm.

Irreparable harm may exist "where the facts show that the final equitable relief may be uncollectible." *Transamerica Ins. Fin. Corp. v. N. Am. Trucking Ass'n, Inc.*, 937 F. Supp. 630, 634 (W.D. Ky. 1996) (citing *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 97 (6th Cir. 1982)). The Court concludes that final equitable relief may be uncollectible because the Fund's assets may dwindle to zero before all outstanding claims are resolved. Indeed, the Court reached the same conclusion in its prior Orders. In its July 14, 2020 Order, the Court noted that evidence submitted in April 2020 indicated that the Fund's estimated unpaid claims exceeded its assets. (*See* Doc. No. 92, PageID# 1451; Doc. No. 70-3, PageID# 1237.) In its January 25, 2021 Order, the Court concluded that final equitable relief may be uncollectible because it was highly unlikely the Fund would ever recover Kavalec's salary payments for the benefit of Fund participants. (Doc. No. 120, PageID# 1808.) The Court concluded that because Kavalec was unable to repay the Fund, participants would suffer irreparable harm because they would not receive full payment on their claims, thus rendering the Secretary's equitable relief (i.e., full restitution of the Fund's losses) uncollectible. (*Id.*)

The Court's prior rationale applies with even greater force now. As of May 31, 2021, the Fund had approximately just $484,862 in liquid assets. (Doc. No. 185-1, PageID# 3049, ¶ 27.) The Secretary estimates that the Fund's liability on the outstanding Medical Mutual claims ranges from $653,117.73 to $1,443,398.15. (Doc. No. 186, PageID# 3144-45; *see also* Doc. No. 185-1, PageID# 3068.) There is no indication that Kavalec or the purported successor trustees intend to address the Medical Mutual claims. (Doc. No. 189, PageID# 3187, ". . . the Fund maintains that there are no outstanding claims.") Thus, the only path forward is to prevent Kavalec and the purported successor

18

trustees from continuing to spend Fund assets on imprudent and disloyal expenses[7] by appointing an independent fiduciary to resolve the remaining claims with the few Fund assets left.

Further, under ERISA § 503, employee benefit plans, such as the Fund, must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant . . . ." 29 U.S.C. § 1133(1).  The regulations governing ERISA claims procedures impose additional requirements on employee benefit plans and plan administrators, including that plans must establish reasonable procedures governing the filing and adjudication of benefits claims, that claims are adjudicated in a reasonable amount of time, that claims are adjudicated consistently and in keeping with the plan documents, and that plans provide participants with notices of adverse benefit determinations and explanations of steps required to perfect benefits claims.  29 C.F.R. § 2560.503-1(b)-(g).  Further, as discussed *supra*, ERISA § 404 imposes three broad duties on qualified fiduciaries: (1) the duty of loyalty, (2) the prudent person fiduciary obligation, and (3) the exclusive benefit rule.  *Hi-Lex Controls, Inc.*, 751 F.3d at 751.

The Medical Mutual claims accrued between 2019 and 2020.  (*See* Doc. No. 185-1, PageID# 3045.)  The Fund's precise liability for these claims remains unclear.  (*Id.*)  The Secretary estimates that the Fund's liability could range from $653,117.73 to $1,443,398.15.  (Doc. No. 186, PageID# 3144-45; *see also* Doc. No. 185-1, PageID# 3068.)  The Fund proffered no evidence or cogent explanation to support its assertion that no claims remain.[8]  Further, there is no evidence in the record to suggest that the Fund, through Kavalec, upheld its duty to provide any notice whatsoever to

---

[7] For example, personal cell phone bills and legal fees associated with meritless motions to clarify.

[8] Former Fund counsel Johnson's unsworn declaration that the Medical Mutual claims data "contain[s] no valid claims information" is devoid of any factual support and utterly unpersuasive.  (Doc. No. 189-1, ¶ 27.)

participants whose claims have not yet been paid, nor its responsibility to ensure that the claims process is administered fairly and consistently and that claims are adjudicated in a timely manner.

What is clear, however, is that, at Kavalec's direction, the Fund's assets have steadily dwindled throughout this litigation with little to show for it. Between April 1, 2019 and May 31, 2021, the Fund incurred $950,599.86 in expenses.  (Doc. No. 185-1, PageID# 3044.)  These expenses included $597,038 in legal fees to former Fund counsel Johnson (who, after two years, remains unable to explain in writing or support via evidence *why* the Fund is not liable for the Medical Mutual claims), as well as $164,423.15 in wrongful compensation to Kavalec, and $2,284.27 for Kavalec's cell phone expenses.  (*Id.*)  As of May 31, 2021, the Fund had approximately $484,862 in liquid assets.[9]  (*Id.* at PageID# 3049, ¶ 27.)  Thus, the Fund no longer has enough assets to resolve what the Secretary contends are the projected Medical Mutual claims.

It appears clear that Kavalec nor the purported successor trustees have any intention of addressing the Medical Mutual claims.  Indeed, in its Opposition, the Fund contends that these claims are "as yet unsubstantiated" when it was Kavalec's duty to substantiate them.  (Doc. No. 189, PageID# 3187.)  The Fund's approach of determining outstanding claims—asking participants to submit claims to the Fund several years later—is insufficient.  The Fund's SPD and participants' insurance membership cards directed participants and their providers to send all claims to Medical Mutual.  (Doc. No. 185-1, PageID# 3090-91, 3122.)  Medical Mutual provided claims data to the Secretary, who then provided the data to former Fund counsel Johnson in December 2019.  (Doc. No. 184-1, PageID# 2865.)  Since then, Kavalec caused the Fund to incur hundreds of thousands of dollars

---

[9] In other words, over the course of two years, the Fund spent more on *just* Johnson's fees, Kavalec's salary, and Kavalec's phone bills ($763,745.42) than it may cost the Fund to resolve what the Secretary projects could be the low end of the Fund's approximate liability for the Medical Mutual claims ($653,117.73).

in expenses but never resolved the Medical Mutual claims. Kavalec and the successor trustees cannot refuse to substantiate participants' claims and then complain that the claims are "as yet unsubstantiated."

The Court agrees with the Secretary that if Kavalec is not removed as trustee, Kavalec's and the purported successor trustees' misuse of Fund assets will continue unabated until the Fund is depleted. Thus, the Court concludes that this factor also weighs in favor of granting a preliminary injunction.

### C.    Harm to Others

Next, the Court must consider "whether a preliminary injunction would cause substantial harm to others." *Flight Options*, 863 F.3d at 540. The Secretary argues that removing Kavalec as the trustee and appointing an independent fiduciary, Receivership Management ("Receivership"), will not cause harm to others because Receivership and its principal, Robert Moore, are well-qualified to do what Kavalec and the successor trustees failed to do for more than two years: address any pending claims and wind down the Fund. (Doc. No. 186, PageID# 3160.) The Fund does not address this factor in its Opposition, but does argue, in the context of its irreparable harm section, that the Fund's remaining assets will be depleted by an independent fiduciary. (Doc. No. 189, PageID# 3188.)

The Court concludes that a preliminary injunction removing Kavalec as trustee and appointing Receivership would not cause substantial harm to others. Rather, appointing an independent fiduciary will prevent additional harm to Fund participants and beneficiaries because Receivership will ensure remaining claims are addressed and the Fund wound down. It is true that it the Fund will have to pay Receivership's fees in return for its services. (*See* Doc. No. 184-4, PageID# 3039.) However, Receivership's fees pale in comparison to the $950,566.86 in expenses Kavalec caused the Fund to

21

incur since the start of this litigation without any resolution of the outstanding Medical Mutual claims. (*See* Doc. No. 185-1, PageID# 3043-68.)  After more than two years of litigation and nearly $1 million in expenses, there is little to show for it.  The Medical Mutual claims must be addressed, and the Fund wound down.  The Fund, Kavalec, and the successor trustees have demonstrated that they have no intention of doing so.  To prevent any further harm to participants, whose claims will otherwise go unpaid, it is now necessary to appoint an independent fiduciary to prevent further waste of Fund assets.  Thus, this factor weighs in favor of granting the Secretary's Motion for Preliminary Injunction.

### D.  Public Interest

The fourth and final factor courts must consider when granting a preliminary injunction is "whether the public interest will be served by an injunction."  *Flight Options*, 863 F.3d at 540.  The Secretary argues that granting its Motion is in the public interest for the reasons the Court previously articulated in its July 14, 2020 and January 25, 2021 Orders, namely that granting a preliminary injunction will advance ERISA's policy objectives.  (Doc. No. 186, PageID# 3161.)  The Fund does not address this factor.  (Doc. No. 189.)  The Court agrees with the Secretary and concludes that this factor favors granting a preliminary injunction.  In passing ERISA into law, Congress determined that employee benefit plans are "affected with a national public interest," and that it was "desirable in the interests of employees and their beneficiaries" that Congress implement "minimum standards" to assure "the equitable character of such plans and their financial soundness."  29 U.S.C. § 1001(a). Granting the preliminary injunction will advance ERISA's stated policy objectives of preventing misuse of plan funds and protecting participants' benefits.  Accordingly, the public interest weighs in favor of granting the Secretary's Motion for Preliminary Injunction.

Because all four factors favor the issuance of a preliminary injunction, the Court will grant the Secretary's Motion for Preliminary Injunction Removing the Fund's Current Trustee and Appointing an Independent Fiduciary.

## IV.    Fund's Motion to Strike

The Fund moved to strike the Secretary's Reply in Support of Plaintiff's Motion for Preliminary Injunction.  (Doc. No. 191.)  The Fund complains that the Secretary essentially implied unethical conduct on the part of Valenti and the Fund's current counsel, Hailperin-Lausch.  (*Id.*, PageID# 3210.)  A court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  "A court has broad discretion in determining whether to grant a motion to strike." *McKinney v. Bayer Corp.*, No. 10–CV–224, 2010 WL 2756915, at *2 (N.D. Ohio July 12, 2010).  However, "motions to strike are disfavored and granted only where the allegations are clearly immaterial to the controversy or would prejudice the movant." *Frisby v. Keith D. Weiner & Assocs. Co., LPA*, 669 F. Supp. 2d 863, 865 (N.D. Ohio 2009).  Although Rule 12(f) only applies to pleadings, a court has "the inherent authority to strike non-pleadings in order to manage its docket." *Taylor v. JP Morgan Chase Bank, N.A.*, No. 3:15-CV-509-HBG, 2018 WL 5777497, at *3 (E.D. Tenn. Nov. 2, 2018).  The Court concludes that the Fund's arguments lack merit.  The Fund fails to identify a single challenged statement that is immaterial to the issues at hand.  The Fund's Motion to Strike is denied.

## V.    Motions to Set Trial Date

The Fund and Kavalec each filed separate Motions for Trial Dates.  (Doc. Nos. 182, 188.)  Because the Court grants the Secretary's Motion for Preliminary Injunction Removing the Fund's Current Trustee and Appointing an Independent Fiduciary, the Court denies both Motions seeking

23

trial dates.  The independent fiduciary will need some time to gain access to, review, and evaluate the

Fund's records, documents, and bank statements[10], as well as evaluate all outstanding claims against

the Fund.  It would be premature to schedule trial dates when the independent fiduciary has not yet

had the opportunity to fully evaluate the outstanding claims against the Fund.  An in-person status

conference is scheduled in this matter for December 6, 2021.  (Doc. No. 174.)  At that time, the Court

expects to receive an update from the independent fiduciary and the parties regarding the status of

the outstanding claims and any progress made towards settlement of this matter.

**VI.     Conclusion**

For the reasons stated above, the Secretary's Motion for Preliminary Injunction Removing the

Fund's Current Trustee and Appointing an Independent Fiduciary (Doc. No. 186) is GRANTED.  IT

IS HEREBY ORDERED that:

1.   Robert Kavalec, ("Kavalec"), Alexandria Pesto ("Pesto"), Milo Valenti ("Valenti"),
     Defendant Board of Trustees ("Board"), any other person serving as a Fund trustee at
     the time of this Order, and anyone acting on their behalf, including their officers,
     agents, employees, assigns, subsidiaries, affiliates, service providers, accountants,
     and attorneys, are removed as fiduciaries and/or trustees, of the Fleet Owners
     Insurance Fund ("Fund").

2.   Receivership Management, Inc. ("Independent Fiduciary") is hereby appointed as the
     Independent Fiduciary to the Fund. The Independent Fiduciary shall also serve as the
     successor Trustee and Plan Administrator of the Fund and shall have full and

---

[10] In its Order *infra*, the Court has set forth specific deadlines by which Kavalec, Pesto, Valenti, Johnson, Hailperin-Lausch, and any other individual, entity, putative trustee, agent, and/or current or former representative of the Fund is to provide the independent fiduciary with the records, books, documents, paper and/or electronic files, and/or other materials related to the management and/or administration of the Fund and Fund assets.

exclusive fiduciary authority over the Fund's administration, management, and control of the Fund's assets, as set forth in ERISA and the Fund's governing documents.

3. Kavalec, Pesto, Valenti, the Board, any other person serving as a Fund trustee at the time of this Order, and anyone acting on their behalf, including their officers, agents, employees, assigns, subsidiaries, affiliates, service providers, accountants, and attorneys, are to immediately notify the Independent Fiduciary within twenty-four (24) hours of entry of this Order of all funds from trust accounts or bank accounts that contain contributions from participating employers, and at the Independent Fiduciary's direction, immediately transfer those assets to a bank account identified by the Independent Fiduciary.

4. Kavalec, Pesto, Valenti, the Board, any other person serving as a Fund trustee at the time of this Order, and anyone acting on their behalf, including their officers, agents, employees, assigns, subsidiaries, affiliates, service providers, accountants, and attorneys, are enjoined to preserve, secure, and immediately produce within seven (7) days of entry of this Order to the Independent Fiduciary, upon the Independent Fiduciary's direction, all books, records, and documents, including electronic files, that relate to the administration, management, and operation of the Fund and the Fund's assets. Additionally, Kavalec, Pesto, Valenti, the Board, and any other person serving as a Fund trustee at the time of this Order shall immediately produce within seven (7) days of entry of this Order all information that identifies the receipt of any

25

monies from participating employers in the Fund and the current location of those monies or assets purchased with those monies.

5.  Kavalec, Pesto, Valenti, the Board, any other person serving as a Fund trustee at the time of this Order, and anyone acting on their behalf, including their agents, officers, employees, assigns, subsidiaries, affiliates, service providers, accountants, and attorneys, are enjoined from expending, transferring, hypothecating, secreting, or otherwise obligating or disposing of any assets of the Fund, and from destroying, altering, or secreting any of the Fund's documents, books, records, or electronic files or data or the documents, books, records, or electronic files or data of any associated trust accounts or bank accounts.

6.  The Fund's former or purported former trustees, including Victor Collova, Charles Alferio, Kavalec, Pesto, and anyone acting on their behalf, including their officers, agents, employees, assigns, subsidiaries, affiliates, service providers, accountants, and attorneys, are enjoined to preserve, secure, and immediately produce within seven (7) days of entry of this Order to the Independent Fiduciary, upon the Independent Fiduciary's direction, all books, records, and documents, including electronic files, that relate to the administration, management, and operation of the Fund and the Fund's assets.

7.  Lance B. Johnson, Lance B. Johnson, LLP, and anyone acting on their behalf, including their officers, agents, employees, associates, assigns, subsidiaries, affiliates, service providers, accountants, and attorneys, are enjoined to preserve, secure, and immediately produce within seven (7) days of entry of this Order to the Independent

Fiduciary, upon the Independent Fiduciary's direction, all books, records, and documents, including electronic files, that relate to the administration, management, and operation of the Fund (including all documents related to legal services performed on behalf of the Fund, including all client files, client communications, and communications with third parties). For avoidance of doubt, because the Fund was the "client' of Lance B. Johnson, and Lance B. Johnson, LLP, no privilege may be asserted by Lance B. Johnson, Lance B. Johnson, LLP, or the Fund against the Independent Fiduciary as to any documents that relate to the administration, management, and operation of the Fund and which were performed on behalf of the Fund.

8. The following trust and bank accounts which hold plan assets that are subject to the control and/or direction of Fund, shall immediately be subject to the Independent Fiduciary' s exclusive control:

    a. All monies in the name of Fund, including the following accounts at the Fifth Third Bank, Cincinnati, Ohio: Business Elite Checking Account No. XXXX9123;

    b. All monies in the name of Fund, including the following accounts at Bank of America, N.A. d/b/a Merrill: ML1 Total Return 2, Account No. XXX-X5S83;

    c. All other assets of the Fund, including insurance policies and subrogation funds, held in accounts other than those set forth above in (a) and (b), above.

9. All of the bank accounts referenced in Paragraph Eight, above, shall be allowed to continue to receive deposits, but any and all transfer or withdrawal of funds from

these accounts shall be done only at the Independent Fiduciary's exclusive control and direction.

10. Kavalec, Pesto, Valenti, the Board, and any other person serving as a Fund trustee at the time of this Order, shall execute and timely tender within seven (7) days of entry of this Order to the Independent Fiduciary or its representative, agent, or attorneys any and all documents, files, or other items necessary to transfer sole control and governance of all accounts in the name of the Fund, including the accounts listed in Paragraph Eight, above, to the Independent Fiduciary.

11. Kavalec, Pesto, Valenti, the Board, and any other person serving as a Fund trustee at the time of this Order, shall require anyone acting on their behalf, including their officers, employees, assigns, attorneys, agents, advisers, and representatives, and all persons who serve in any capacity that involves decision-making authority for them, to act and discharge their duties in full compliance with the terms of this Order and shall require that they not take any action in the discharge of such duties that is inconsistent with the terms of this Order. Kavalec, Pesto, Valenti, the Board, and any other person serving as a Fund trustee at the time of this Order, also shall require anyone acting on their behalf, including their officers, employees, assigns, attorneys, agents, advisers, representatives, and all persons who serve in any capacity that involves decision-making authority for them, as a condition of maintaining their relationships with them, to cooperate completely and immediately with the Independent Fiduciary in the performance of the Independent Fiduciary's duties and responsibilities.

12. Kavalec, Pesto, Valenti, the Board, and any other person serving as a Fund trustee at the time of this Order, shall provide a copy of this Order to anyone acting on their behalf, including all of their officers, employees, assigns, attorneys, agents, advisers, representatives and all persons who serve in any capacity that involves any decision making authority for them, within five (5) days after the entry of this Order.

13. The Independent Fiduciary shall have sole and exclusive responsibility and authority to control and manage the Fund and all assets of the Fund, including, but not limited to:

    a. Authority to exercise all fiduciary responsibilities relating to the Fund, including, but not limited to, the responsibility to act as the administrator of the Fund;

    b. Authority given to trustees under the terms of the documents governing the Fund;

    c. Authority to amend the documents governing the Fund;

    d. Exclusive authority to appoint, replace, and remove such administrators, trustees, attorneys, employees, assigns, agents, and service providers, as the Independent Fiduciary shall, in the Independent Fiduciary's sole discretion, determine are necessary to aid the Independent Fiduciary in the exercise of the Independent Fiduciary's powers, duties, and responsibilities to the Fund;

    e. Authority to conduct an accounting of all medical claims and negotiate all medical claims;

29

f.   Authority to terminate the Fund, if it is in the best interest of the Fund and, in that event, to establish a claims submission deadline and to adjudicate all claims filed by such deadline and to deny claims not filed by the claims submission deadline;

g.   Authority to adjudicate and pay or deny all claims submitted to the Fund;

h.   Authority to pursue recovery of monies owed and due to the Fund from any person obligated to make such payments under the terms and conditions of the Fund;

i.   Authority to identify and pursue recovery of the Fund's assets as well as any monies to which the Fund has a right of recovery;

j.   Authority to identify and pursue claims on behalf of the Fund;

k.   Except as provided herein, the authority to delegate to such administrators, trustees, attorneys, employees, agents, assigns, and service providers such fiduciary responsibilities as the Independent Fiduciary shall determine appropriate. The Independent Fiduciary may not, however, delegate the authority to appoint, replace and remove such administrators, trustees, attorneys, employees, agents, assigns, and service providers or the responsibility to monitor the activities of the trustees, attorneys, employees, agents, assigns, and service providers of the Fund; and

l.   Authority to pay itself reasonable and necessary fees from the Fund and pay the reasonable and necessary fees of service providers, pursuant to the requirements of Paragraph Fifteen of this Order.

14. The Independent Fiduciary shall not be discharged or terminated during the duration of this Order except by leave of Court, upon application by either the Secretary or the Independent Fiduciary. Upon termination, discharge, or resignation of the Independent Fiduciary during the term of this Order, the Secretary shall recommend a successor Independent Fiduciary for appointment by the Court. Recommendations for a successor Independent Fiduciary shall be made by the Secretary within such periods as the Court, by further order, may provide and require.

15. The Fund is authorized and directed to pay the reasonable compensation, fees and expenses of the Independent Fiduciary and such person(s) and firm(s) retained by the Independent Fiduciary in the performance of services to or for the Fund, subject to the following procedures:

   a. Before causing the Fund to pay compensation, fees or expenses to the Independent Fiduciary or any person or firms retained by the Independent Fiduciary, the Independent Fiduciary shall provide written notice of such compensation, fees or expenses, by filing a Fee Notice with this Court and by serving a copy to the Secretary. The fee notice shall include a detailed invoice itemizing the compensation, fees and expense to be paid by the Fund. The Independent Fiduciary shall not be required to file, service, or otherwise deliver the Fee Notice to any person or persons other than the Court, the Secretary, or the Fund. If within fifteen (15) days after filing of a Fee Notice, no objection to the Fee Notice or payment by the Fund of the compensation, fees, or expenses described therein is filed with this Court, such compensation,

fees, and expenses shall be deemed reasonable expenses of the Fund and shall be paid by the Fund without further action or approval of this Court. If an objection to a Fee Notice or payment by the Fund of the compensation, fees, or expenses described therein is filed with this Court, within fifteen (15) days after filing of such Fee Notice (or such other time as the Court may determine), the Court shall hold a hearing on the matter and the compensation, fees, expenses described in the Fee Notice shall be paid by the Fund only to the extent approved by the Court.

16. This Order shall not be construed to limit the Secretary or the Independent Fiduciary from seeking to hold any other person liable for the fees and expenses paid to, or incurred by, the Independent Fiduciary as appropriate equitable relief under ERISA or under any other applicable law.

17. The Independent Fiduciary shall cooperate fully with the Secretary in the exercise of the Secretary's enforcement responsibilities under ERISA, inter alia, by promptly providing such documents, information and persons under the Independent Fiduciary's control as the Secretary from time to time may request. Nothing herein shall be construed to limit the rights of the Secretary to maintain access to documents, information or persons or to waive or restrict the exercise by the Independent Fiduciary and any individual of his or her constitutional rights.

18. The Secretary may provide to the Independent Fiduciary any documents necessary to the administration of the Fund and to assist the recovery and identification of the Fund's assets. To the extent any privilege or confidentiality applies to any such

documents, the privilege or confidentiality is not waived and is preserved when documents are provided to the Independent Fiduciary.

19. The payment of administrative expenses and all fees to the Independent Fiduciary and the Independent Fiduciary's assistants, attorneys, accountants, actuaries and other necessary service providers are to be considered priority administrative expenses of the Fund, superior to any other class of expense or obligation of the Fund and the Independent Fiduciary's second priority is to be the payment of legitimate claims. On a quarterly basis, the Independent Fiduciary shall provide the Secretary with a report of all significant actions taken and all Fund assets expended in its administration of the Fund.

20. The Independent Fiduciary shall have standing to enforce this Order, including the authority to seek contempt or other appropriate sanctions against any party that fails to comply with any provision of this Order. 20. The terms of the documents governing the Fund are hereby amended to include the terms of this Order. This Order shall, for the term of this Order, supersede all other provisions in any documents governing the Fund that are inconsistent with the terms of this Order including, but not limited to, the Fund's documents and trust agreements.

21. Nothing in this Order shall be construed:

    a.  To limit the powers and responsibilities of any officer or employee of the United States under ERISA or any other law, or

    b.  To relieve the Fund, or any of their administrators, fiduciaries, officers, trustees, custodians, attorneys, agents, employees, assigns, advisers, providers

33

of goods or services, consultants, representatives in any capacity, or persons who serve in any capacity that involves decision making authority or custody or control of the monies, funds or assets of the Fund prior to the appointment of the Independent Fiduciary of any duty, responsibility, or liability under ERISA or any other law.

22. This Court shall retain jurisdiction over the parties and subject matter of this action for the purpose of enforcing this Order. Provisions of this Order requiring service and notice to the Independent Fiduciary and the Secretary shall be satisfied by delivering it in writing as follows:

    **a.  To the Independent Fiduciary:**
    Receivership Management, Inc.
    510 Hospital Drive, Suite 490
    Madison, TN 37115

    **b.  To the Secretary:**
    Office of the Solicitor
    Attn: Leah A. Williams
    1240 East 9th Street
    Cleveland, Ohio 44199

The parties to this Order may, as they deem necessary, change the designation of persons to receive service and notice on their behalf by filing with the Court notification of such change and serving a copy thereof on the other party or parties to this Order.

23. Any party subject to this Order may seek relief from or amendment to this Order.

24. Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, no bond or other security shall be required of the Secretary.

34

**IT IS SO ORDERED.**

_s/Pamela A. Barker_
PAMELA A. BARKER
Date: October 26, 2021       U. S. DISTRICT JUDGE